IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| SHANEQUA MCCRAE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | CIVIL ACTION NO. |
| v. | ) | |
| | ) | |
| EMORY UNIVERSITY, | ) | |
| | ) | JURY TRIAL DEMANDED |
| Defendant. | ) | |

## COMPLAINT

COMES NOW Plaintiff Shanequa McCrae ("Plaintiff") and files this Complaint against Defendant Emory University ("Defendant") by and through her undersigned counsel, seeking recovery of damages and other appropriate relief for employment discrimination, respectfully showing the Court as follows:

## PRELIMINARY STATEMENT

1.

This is a civil action brought on behalf of Plaintiff Shanequa McCrae ("Plaintiff") against Defendant Emory University, for race and pregnancy discrimination and retaliation in violation of Title VII, and the Pregnancy Discrimination Act ("PDA"), the Americans With Disabilities Act, 42 U.S.C. Section 1981 ("Section 1981"), the Equal Pay Act, as well as together with any and all other causes of action which can be reasonably inferred from the facts as set forth below.

1

## THE PARTIES

2.

Plaintiff is a Black female citizen of the United States who resided in Decatur, Georgia at all relevant times. Plaintiff was subject to race, disability and pregnancy discrimination that resulted, ultimately, in her termination from Defendant Emory University.

3.

Additionally, upon information and belief, Plaintiff was paid less than her male counterparts.

4.

Plaintiff is and was, at all times relevant herein, Defendant Emory University's "employee" within the meaning of all relevant Federal, State and local laws, including, but not limited to, Title VII, Section 1981, the Americans with Disabilities Act, the Pregnancy Discrimination Act, and the Equal Pay Act.

5.

Upon information and belief, at all times herein, Defendant Emory University. (hereinafter "Defendant Emory University") was and is a corporation registered to do business in Georgia. Upon information and belief, Defendant Emory University's student health clinic is located at 1525 Clifton Road, Atlanta, Georgia 30329.

6.

Defendant Emory University is and was, at all times relevant herein, Plaintiff's "employer" within the meaning of all relevant Federal, State and local laws, including, but not limited to, Title VII, Section 1981, the Americans with Disabilities Act, the Pregnancy Discrimination Act, and the Equal Pay Act.

## JURISDICTION, VENUE, AND PROCEDURAL REQUIREMENTS

7.

This is a civil action for monetary damages and such other relief as the Court deems just and proper based upon Defendant Emory University's discrimination and retaliation against Plaintiff based on race, gender, pregnancy, and Defendant's retaliation and wrongful constructive discharge of Plaintiff.

8.

This Court has Jurisdiction over this action under 42 U.S.C.A. § 2000(e) et. seq., and under 28 U.S.C.A. §§1331 and 1343(4).

9.

Venue for this action properly lies in this district pursuant to 28 U.S.C § 1391.

10.

All conditions precedent to filing the instant action have been fulfilled. On or about March 3, 2021 Plaintiff filed a timely Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC"). On or about May 26, 2022 the

EEOC issued Plaintiff a Notice of Right to Sue. This action is being brought within 90 days of Plaintiff's receipt of her Notice of Right to Sue.

## DEMAND FOR JULY TRIAL

### 11.

Plaintiff hereby demands a jury trial of each count of the complaint.

## FACTUAL BACKGROUND

### Plaintiff Is Hired at Defendant Emory University

### 12.

In or about June 2018, Plaintiff was hired by Defendant Emory University as a Licensed Practical Nurse II. At the time, Plaintiff had about 4 years of nursing experience.

### 13.

Upon information and belief, Plaintiff and other female employees were paid less than their male counterparts and/or less than market rate for the work they did.

### 14.

Plaintiff's supervisor upon her hire was the Director of Nursing of Emory Student Health Services Lisa Hastings ("Supervisor Hastings")

**Plaintiff Excels in her Role**

15.

From June 2018 through mid-2019, Plaintiff received consistently positive feedback and performance reviews from Supervisor Hastings.

16.

In or around mid-2019, Supervisor Hastings left Defendant Emory University and two nurses took over as interim directors while Defendant searched for a replacement.

**Plaintiff Takes Leave During the Pandemic to Care For her Child**

17.

In or around March 2020, after outbreak of COVID-19 in the US, Defendant Emory University began an initiative to assist employees with trouble securing childcare by allowing them to take paid leave.

18.

Plaintiff was not able to find care for her child and went on paid leave.

**Plaintiff Receives a New Supervisor**

19.

In or around April 2020, while Plaintiff remained on paid leave, Kimberly Crow was hired as Director of Nursing of Emory Student Health Services ("Director Crow") and became Plaintiff's new direct supervisor.

20.

In or around May 2020, Director Crow scheduled a one on one Zoom meeting with Plaintiff and informed her that her paid leave was ending and she was required to return to work in person.

21.

In or around June 2020, Plaintiff returned to work in person as a Licensed Practical Nurse II. Plaintiff was assigned to the temperature monitoring station where nurses checked the temperature of every patient entering the building.

**Director Crow treats Black Employees less Favorably than White Employees**

22.

As Plaintiff began working in person again under her new supervisor she noticed that Director Crow perpetuated a racially discriminatory work environment.

23.

Director Crow, who is White was friendly, kind, polite and cordial to White employees, and regularly engaged with them, but she was cold and often directly hostile towards Plaintiff and other Black employees.

24.

Plaintiff and her Black co-workers regularly discussed the racially discriminatory work environment created by Director Crow. Plaintiff observed that it was common for Black employees to have difficulties getting their PTO or any

accommodations - and even breaks of any kind - approved by Director Crow, while White employees never had issues with PTO or accommodations.

25.

Plaintiff also noticed that Director Crow micromanaged her and other Black employees by checking in with them and demanding to know what they were doing on a much more frequent basis than she did with White employees.  Director Crow made it obvious that she did not believe that Black employees were working as hard as White employees.

26.

Plaintiff heard of multiple instances of Director Crow accusing Black employees of stealing time, but did not hear of her accusing White employees of such, though for the most part, all of the employees (Black or White), acted similarly at work.

**Director Crow Assigns Plaintiff and other Black Employees to the**
**Unfavorable Temperature Monitoring Station**

27.

Plaintiff also noticed that Black employees were routinely given more unfavorable assignments than White employees by Director Crow.

28.

For example, no White employees were assigned to the unfavorable temperature monitoring station, where Plaintiff was assigned. This assignment was

unfavorable because it involved relentless work checking the temperatures of people with COVID-19 or COVID-19 symptoms. Nurses at this station were exposed to a high volume of people with COVID-19, and had to get close to them in order to check their temperatures.

29.

The temperature monitoring station was also unfavorable because the nurses had very little coverage to take lunch breaks or even bathroom breaks and they were often left there for several hours without relief. Multiple times a week, Plaintiff would go an entire shift from 8am to 3pm without coverage to eat.

30.

Director Crow closely monitored the temperature monitoring station of all non-White employees and reprimanded those who left the station to take lunch or bathroom breaks when there was not coverage, even though there was consistently not coverage.

31.

Upon information and belief, White employees were given more coverage to take lunch breaks and bathroom breaks than Black employees.

**Plaintiff Begins Experiencing Extreme Nausea and Vomiting
and Learns she is Pregnant**

32.

In or around June 2020, Plaintiff began experiencing increasingly severe and persistent nausea and vomiting.

33.

On or around June 27, 2020, Plaintiff found out she was pregnant via an at-home test.

34.

Plaintiff suffered Hyperemesis Gravidarum in her previous pregnancies and feared she had it again. Hyperemesis Gravidarum is a severe type of nausea and vomiting during pregnancy that can have serious complications such as dehydration and malnutrition. Plaintiff made an appointment with a doctor to confirm the diagnosis.

35.

From her past pregnancies Plaintiff understood the importance of maintaining a healthy eating regimen to ease the nausea and keep food down in order to protect her health and the health of her unborn child.

**Director Crow Aggressively Berates Plaintiff for Eating Lunch**

36.

On or around July 21, 2021, Plaintiff completed a shift at the temperature monitoring station but the person due to relieve her for her twenty-minute lunch break did not show up.

37.

Plaintiff had been working from around 8am to 3pm without coverage which prevented her from being able to take a break to eat.

38.

Plaintiff felt unwell from not eating, and it was clear that her Hyperemesis Gravidarum was acting up, so she quickly left the station to eat at her desk as fast as she could. She also knew if she did not eat during her scheduled break before her next shift she would not be able to eat the rest of the day, making her sickness even worse.

39.

Plaintiff knew there was no real problem with her leaving the temperature monitoring station for a short period without coverage as there were several temperature monitoring stations throughout the building and if a patient could not go to her station they would simply go to another one.

40.

Director Crow confronted Plaintiff a few minutes after she left the station and berated Plaintiff for leaving the station.  Plaintiff told Director Crow that she was not feeling well from not eating and that she had to eat, but Director Crow angrily told Plaintiff she was "not a team player."

**Plaintiff Complains about Director Crow and Discloses her Pregnancy to HR**

41.

On or around July 21, 2020, Plaintiff reported Director Crow to HR Manager Mekeshua North ("HR Manager North") via email. Plaintiff reported that Director Crow pulled her off her lunch break and reprimanded her for leaving her station, even when Plaintiff reported that she was feeling sick due to not eating.

42.

Plaintiff also disclosed to HR Manager North that she was pregnant and she would feel extremely ill going prolonged periods of time without food. Plaintiff requested that Defendant Emory University accommodate her need for regular lunch breaks.

43.

On or around July 22, 2020, HR Manager North called Plaintiff and advised her to send HR a confirmation of pregnancy and medical attestation form to support her request for an accommodation.

**Plaintiff is Diagnosed with Hyperemesis Gravidarum and Requests
Accommodations**

44.

On or around July 24, 2020, Plaintiff went to a doctor regarding her pregnancy

and symptoms.

45.

Plaintiff was formally diagnosed with Hyperemesis Gravidarum.

46.

Plaintiff's doctor advised her to eat several small meals throughout the day to

avoid worsening symptoms such as fainting or vomiting.

47.

Plaintiff's doctor provided a letter to her employer stating that she was at risk

for severe illness in the case of COVID-19 due to her pregnancy. Part of the note

stated:

> *"I would recommend Ms. McCrae not work with any Covid-19 patients as
> she is currently pregnant. Please ensure every measure to offer Ms McCrae
> additional protection from exposure, including social distance (minimum 6
> feet per CDC guidance), personal protective equipment, and any other
> appropriate precautions be taken. In addition if teleworking is an option,
> she should be allowed to work from home as much as her schedule would
> permit"*

48.

Along with the doctor's note, Plaintiff submitted to HR a "COVID-19

Attestation Form" where she requested reasonable accommodations relating to her

pregnancy and diagnosis of Hyperemesis Gravidarum. Plaintiff wrote "I would like to be exempt from working in covid clinics/covid patients and provided regular allotted times for eating/snacking/a lunch break. I can continue to work, but would need proper accommodations."

### Plaintiff Discloses her Pregnancy and Disability to Director Crow and Requests a Different Assignment

49.

In or around late July 2020, after submitting her documentation to HR, Plaintiff also disclosed her pregnancy to Director Crow. Plaintiff hoped that disclosing her pregnancy could make Director Crow more understanding of why she needed accommodations-especially the opportunity to eat during shifts that could last as long as seven hours without a break.

50.

Plaintiff told Director Crow that due to her pregnancy and her diagnosis of Hyperemesis Gravidarum she needed a different assignment besides the temperature monitoring station due to the lack of regular breaks and exposure to COVID-19. Plaintiff pointed out that she could not even eat small snacks or drink water while at the temperature monitoring station because she would be exposed to COVID-19 if she took her mask off.

51.

Director Crow told Plaintiff she could not change her assignment at the clinic because she was pregnant. Director Crow told Plaintiff the clinic could not accommodate her need for regular breaks to eat in any way.

52.

Upon information and belief, had Plaintiff been White, Director Crow would have changed her assignment at her request-even without a doctor's note.

**Plaintiff's Condition Worsens due to the lack of Accommodation**

53.

Despite Plaintiff complaining to HR, completing medical paperwork, and asking for accommodations from HR and her Supervisor, she was not transferred to a new assignment.

54.

Plaintiff continued to be assigned to the temperature monitoring station, and was thus regularly exposed to patients who had coronavirus symptoms, despite her doctor's recommendation.

55.

Plaintiff continued not being able to maintain social distance with COVID-19 patients and those with COVID-19 symptoms.

56.

She was also regularly forced to go long stretches of times, often as long as seven hours, without eating; which aggravated her Hyperemesis Gravidarum. Plaintiff routinely felt fatigued and faint on the job and often had to rush to the restroom to vomit as a result of not being able to eat and keep her condition under control. Of course, since restroom breaks were not allowed  without coverage, Plaintiff had to rush back to her station and hope Director Crow would not reprimand her.

57.

Plaintiff was overcome by stress and anxiety worrying about her health and the health of her unborn child.

58.

Despite fearing repercussions from her supervisor, Plaintiff occasionally left the temperature monitoring station to quickly eat small meals or snacks at her desk in order to prevent vomiting.

**Director Crow Escalates the Harassment**

59.

Meanwhile, in or around late July 2020, Director Crow escalated her targeted harassment of Plaintiff after Plaintiff's complaints and requests for reasonable

accommodations. Upon information and belief, Director Crow knew that Plaintiff had complained about her to HR.

60.

Director Crow sharply reprimanded Plaintiff for taking short breaks to eat even though Plaintiff regularly told her she felt sick. Plaintiff observed that after her complaint, Director Crow monitored her much more strictly than other employees, even the other Black employees, whom she always micromanaged.

61.

On one occasion in or around August 2020, Director Crow again reprimanded Plaintiff for taking a lunch break from her assignment at the temperature monitoring station. She snapped at Plaintiff that she, "eats too much."

62.

Plaintiff, taken aback by the bizarre comment, reminded Director Crow that she was pregnant and suffering from a serious health condition and trying to take care of her health.

63.

Plaintiff became increasingly afraid to take breaks to eat because she feared for her job if Director Crow caught her. This was all despite the fact that there was no real danger in Plaintiff leaving the station for a short period to eat as there were other temperature monitoring stations.

64.

Upon information and belief, Director Crow targeted Plaintiff due to her race, pregnancy, disability, and in retaliation for reporting her to HR and for asking for reasonable accommodations.

### Plaintiff is Reprimanded in her Mid Year Review for taking Food Breaks

65.

In or around August 2020, Director Crow conducted Plaintiff's mid-year review.

66.

Director Crow informed Plaintiff that she was being penalized for taking small meal breaks.

67.

In the written review, under the section titled "Taking Initiative," Director Crow gave Plaintiff a rating of "Needs improvement" and wrote "Shanequa often eats and has food open at her workstation while taking care of patients"

68.

Plaintiff was shocked by the feedback and by the fact that her multiple requests for accommodations relating to her need to have breaks to eat were completely ignored.

69.

Plaintiff reminded Director Crow yet again that she was pregnant and due to her Hyperemesis Gravidarum she needed to eat throughout the day in order to avoid vomiting.

70.

Director Crow became frustrated with Plaintiff and told her she was prohibited from going to her desk to eat while she was scheduled to be working somewhere else even if that meant her going a long stretch of time without eating.

71.

Director Crow told Plaintiff she had violated clinic policy and if she did not stop doing so she would be terminated.

**Plaintiff Requests Working from Home**

72.

At this point in the meeting, Plaintiff realized Director Crow would continue to harass her and compromise her health if she continued working in person.

73.

Plaintiff requested that she be able to work from home.

74.

Director Crow approved the request but condescendingly told Plaintiff it was "very important" for her to "stay focused" while working from home.

75.

Director Crow added that Defendant Emory University had a new Covid Child Care Leave Policy which provided 120 paid hours to employees with trouble securing childcare. Director Crow explained that it would be necessary for Plaintiff to use this leave to maintain a 40 hour work week as there were already two other Licensed Nurse II's working from home, and there would not be enough work to give to her.

76.

Director Crow told Plaintiff she could begin working from home on September 11, 2020.

**Plaintiff Requests Redeployment to a Different Department at Full Time**

77.

Plaintiff was troubled by Director Crow's claim there might not be enough work to keep her full time. She was faced with either working in a discriminatory work environment that endangered her health or losing her full-time status.

78.

Plaintiff decided to request that Defendant Emory University "redeploy" her to another department. "Redeployment" was a company practice designed to allow employees working from home to transfer departments if their current department did not have enough work for them due to the pandemic.

19

79.

On or around September 4, 2020, Plaintiff emailed HR Manager North requesting redeployment to another department since Director Crow told her there would not be sufficient remote work for her to remain full time.

80.

Director Crow called Plaintiff the next day saying she knew about Plaintiff's request and told her she could not be redeployed because her current department had a lot of work that needed to be done.

81.

Plaintiff was baffled as Director Crow just told her there would not be enough work for her. Director Crow refused to provide an explanation of how, if the apartment needed all the staff it could get, Plaintiff was not being given enough work.

**Plaintiff's White Co-worker is Given a 40-hour work week Plus Overtime, while Plaintiff is not Given Enough Work**

82.

On or around September 11, 2020, Plaintiff began working remotely.

83.

While working remotely, Plaintiff was in frequent contact with her remote counterpart, Sharon Denny ("Co-worker Denny") who was another Licensed Practical Nurse II.

84.

Both Co-worker Denny and Plaintiff were assigned client-based duties which revolved around telehealth appointments.

85.

However, Plaintiff quickly noticed that Co-worker Denny, who is White, was given extra administrative duties on top of their client-based duties.

86.

Co-worker Denny regularly talked about and complained of how much overtime work she was being given.

87.

Meanwhile, Plaintiff was not given enough work to maintain a 40-hour workweek.

88.

Plaintiff called Director Crow multiple times during her first week remote and asked for additional assignments, such as the ones being given to Co-worker Denny, so she could remain fulltime. Director Crow said she would not be giving Plaintiff any additional tasks and that she could use Covid child-care leave to supplement the rest of her hours.

89.

On September 18, 2020, Plaintiff emailed HR Representative Aisha Fuller ("HR Rep Fuller") complaining that she was not being given enough work to be fulltime while her co-worker was being given overtime. HR Rep Fuller told Plaintiff she would look into it but no action was taken on her behalf.

**Director Crow Accuses Plaintiff of Stealing Time, Asks her to Log All of her Tasks**

90.

On or around September 18, 2020, Director Crow called Plaintiff and ordered her to make a daily log of all of her tasks, because she thought Plaintiff "was stealing time from" Defendant Emory University.

91.

Plaintiff, baffled, replied that there was already an electronic record of all the tasks she completed in Defendant Emory University's medical record system.

92.

Upon information and belief, Director Crow did not ask White employees to submit a daily log of their tasks and did not accuse White employees of stealing time.

93.

Director Crow said she did not feel Plaintiff's time was accurate because she "[has] a child at home" and she could not imagine how she completed eight hours of work in a day.

94.

As Plaintiff continued in her remote position, Director Crow called her every day, even if there was nothing to discuss, saying things like "I'm just making sure you're working." Director Crow constantly forced Plaintiff to verify she was actually working and explain her tasks.

95.

In or around September 2020, Plaintiff spoke with Co-worker Denny and asked her if Director Crow ever required her to submit a daily log of all the work she completed in a day.  Co-worker Denny replied that she had not. Co-worker Denny also stated that Director Crow never questioned her time and never denied her 40 hours of work a week.

**Plaintiff Again Requests Redeployment and Complains
about Director Crow**

96.

On or around September 18, 2020, Plaintiff emailed HR Rep. Fuller, making a second request to HR for redeployment to another department where she would be given full time hours.

97.

Plaintiff also reported that Director Crow told her to make a daily log of all her tasks because she did not believe she was actually working and accused her of stealing time.

98.

HR Rep Fuller said she would discuss the request with HR Manager North but never got back to Plaintiff.

99.

Upon information and belief, HR Manager North knew there should have been enough work in the department and put pressure on Director Crow to end her discriminatory practice of assigning more hours to White employees.

**Director Crow revokes Plaintiff's Remote Work**

100.

On or around October 8, 2020, Director Crow emailed Plaintiff saying that she was revoking remote work from Plaintiff, effective mid-October, "due to the needs of the clinic and work from home volume."

101.

Notably, Co-worker Denny was scheduled to work from home until July 2021 and continued to not only work from home, but continued to be assigned overtime hours every week.

102.

Furthermore, around this time in or around October 2020, an email was sent out to the clinic that Defendant Emory University Student Health Services would be *increasing* telehealth appointments which would create more work for the remote

Licensed Practical Nurses. This directly contradicted Director Crow's claim there would not be enough work for Plaintiff.

103.

Upon information and belief, Director Crow removed Plaintiff from remote work due to her race, pregnancy and caregiver status, and out of retaliation for complaining to HR and trying to get reasonable accommodations.

**Plaintiff Complains to HR about Race Discrimination**

104.

On or around October 9, 2020, Plaintiff emailed a complaint to HR Manager North about the "disparate treatment" that Director Crow subjected her to in comparison to Co-worker Denny.

105.

Plaintiff complained that she was asked to submit a daily log of her tasks and was not believed when reporting her hours, unlike Co-worker Denny.

106.

Plaintiff also complained that Director Crow only gave her two assignments a day, but gave Co-worker Denny 4-5 assignments a day.

107.

Plaintiff explained that she consistently asked for more assignments but Director Crow either never assigned them to her or suggested she do assignments such as contact tracing that she was never given training on.

108.

At the end of her complaint, Plaintiff stated the following:

*I believe the treatment received by Ms. Crow is racially charged. I have been flexible with her request from the moment I began working from home, and my integrity and work ethic has been attacked on a consistent basis. I am requesting equivocal*[sic] *treatment to the other work from home employee or to be temporarily redeployed to be able to maintain remote working as initially requested.*

109.

HR Manager North replied to Plaintiff that the complaint would be investigated.

110.

In or around mid-October, while HR was "investigating" her discrimination complaint, Plaintiff took her remaining Covid childcare leave in order to avoid returning in person before the investigation concluded.

**HR Threatens Plaintiff's Job and Reassigns her to Temperature Monitoring**

111.

In or around November 2020, HR Manager North and Director of Employee Relations Karen Truesdale ("Director Truesdale") emailed Plaintiff that they had

reviewed her complaint and that she would be reassigned to in person work at the temperature monitoring station as an "accommodation."

112.

Neither HR Manager North nor Director Truesdale made any reference to Plaintiff's complaint of race discrimination.

113.

HR Manager North warned Plaintiff that if she did not take the new assignment, it would be considered job abandonment and she would be terminated.

114.

When Plaintiff expressed her concerns with the temperature monitoring station about how Director Crow did not provide her adequate accommodations for her pregnancy, Director Truesdale said she would "look into" remote work for her.

115.

Director Truesdale got back to Plaintiff later in November and told her she was not eligible to work in another department and that there "were no work from home duties available."

116.

Plaintiff was faced with extreme stress and anxiety at the prospect of returning to work at the temperature monitoring station where she would be exposed to COVID-19 patients and be forced to go extended periods of time without eating.

Plaintiff also feared the retaliation, harassment, and continued discrimination she would face from Director Crow working back in person.

117.

Plaintiff began applying for FMLA leave as her only option to protect her health and maintain her job.

**Plaintiff takes FMLA Leave under duress**

118.

In or around December 2020, Plaintiff went on FMLA leave.

119.

On or around February 21, 2021, Plaintiff gave birth to her child.

**Plaintiff Returns to Work Only to Face Worse Discrimination and Retaliation**

120.

In or around May 2021, Plaintiff returned to work from FMLA leave.

121.

When Plaintiff returned to work, Director Crow immediately made it clear that she was not happy to see Plaintiff and did not want her on Director Crow's team.

122.

When they reviewed her assignments, Director Crow made sure to remind Plaintiff that she was not entitled to any breaks and threatened Plaintiff and made it clear that she had a target on her back.  She told Plaintiff that since she had "agreed

to come back to work" she "should be able to do [her] assignments now without complaining."

123.

Upon information and belief, Director Crow was threatening Plaintiff to do her job with no breaks and without daring to complain about disparate treatment. Upon information and belief, Director Crow thought Plaintiff was "lucky" to have kept her job throughout her pregnancy, despised her for reporting Director Crow and complaining of racial discrimination, and for requesting accommodations. It was also clear that Director Crow continued to believe that Plaintiff had "stolen time" by working at home and made her feel like Director Crow considered her a criminal who did not deserve her job.

124.

Working in person again, Plaintiff continued to notice that, while she was treated the worst of all, Director Crow treated all Black employees less favorably than White employees. She micromanaged Black employees, constantly "checking in" with them to make sure they were working, and routinely denied Black employees' requests for accommodations or PTO. She continued to be cold and hostile towards Black employees, while warm and personable with White employees.

125.

Director Crow clearly trusted White employees more than Black employees and did not discipline them as much as Black employees. For example, Director Crow did not give warnings to White employees who were late, but penalized Black employees for being even one minute late.

126.

In or around June 2021, Plaintiff arrived at work late 10-15 minutes late and was given a verbal warning by Director Crow.

127.

Plaintiff was extremely upset as she knew this one misstep would show up in her formal performance review, even though it would easily be excused or ignored for a White employee.

**Plaintiff is Constructively Terminated**

128.

The racially discriminatory and retaliatory work environment that Plaintiff was subject to took so much of a toll on Plaintiff that she could no longer handle it.

129.

Plaintiff felt like she had a target on her back due to her race, her past pregnancy, and her reports of discrimination.

130.

In or around August 2021, Plaintiff resigned due to the discriminatory and hostile work environment and the retaliation she continued to endure.

## CAUSES OF ACTION

### COUNT I
*(Race, Gender, Pregnancy, and Disability Discrimination in Violation of Title VII, the Pregnancy Discrimination Act, and the Americans with Disabilities Act)*

131.

Plaintiff re-alleges and incorporates by reference each and every allegation in each and every aforementioned paragraph as if fully set forth herein.

132.

Defendant Emory University has discriminated against Plaintiff in violation of Title VII, the Pregnancy Discrimination Act, and the Americans with Disabilities Act. Plaintiff has suffered both disparate impact and disparate treatment as a result of Defendant Emory University' wrongful conduct.

133.

Defendant Emory University has discriminated against Plaintiff by treating her differently from and less preferably than similarly-situated male, non-Black, and non-pregnant employees and by subjecting her to a hostile work environment, discriminatory pay, discriminatory denial of promotions, disparate terms and conditions of employment, and other forms of discrimination on the basis of her sex,

race, disability, and status as a pregnant woman in violation of the law.

134.

Defendant Emory University's conduct has been intentional, deliberate, willful, malicious, reckless and conducted in callous disregard of the rights of Plaintiff, entitling Plaintiff to punitive damages.

135.

By reason of Defendant Emory University's discrimination, Plaintiff is entitled to all remedies available for violations of Title VII, the Americans with Disabilities Act, and the Pregnancy Discrimination Act. Plaintiff shall seek attorney's fees and punitive damages.

## **<u>COUNT II</u>**
*(Retaliation in Violation of Title VII, the Pregnancy Discrimination Act, and the Americans with Disabilities Act)*

136.

Plaintiff re-alleges and incorporates by reference each and every allegation in each and every aforementioned paragraph as if fully set forth herein.

137.

Plaintiff repeatedly reported to Defendant Emory University about Defendant Emory University' discriminatory treatment of her.

138.

In retaliation, Defendant Emory University subjected Plaintiff to a series of

adverse employment actions including, but not limited to, subjecting Plaintiff to a hostile work environment, disparate treatment, and a termination of Plaintiff's employment.

139.

Defendant Emory University's conduct has been intentional, deliberate, willful, malicious, reckless and conducted in callous disregard of the rights of Plaintiff.

140.

As a result of Defendant Emory University's conduct alleged in this Complaint, Plaintiff has suffered and continues to suffer harm, including but not limited to lost earnings, lost benefits, other financial loss, and non-economic damages.

141.

By reason of Defendant Emory University's discrimination, Plaintiff is entitled to all remedies available for violations of Title VII, the Pregnancy Discrimination Act, and the Americans with Disabilities Act. Plaintiff shall seek attorney's fees and punitive damages.

## **COUNT III**
*(Race Discrimination in Violation of 42 U.S.C. § 1981)*

142.

Plaintiff re-alleges and incorporates by reference each and every allegation in

each and every aforementioned paragraph as if fully set forth herein.

143.

Defendant Emory University has discriminated against Plaintiff in violation of 42 U.S.C. § 1981, by subjecting her to different treatment on the basis of her race. Plaintiff has suffered both disparate impact and disparate treatment as a result of Defendant Emory University's unlawful conduct.

144.

Defendant Emory University has discriminated against Plaintiff by treating her differently from and less preferably than similarly-situated Caucasians and by subjecting her to disparate terms and conditions of employment, and other forms of discrimination on the basis of her race in violation of 42 U.S.C. § 1981.

145.

The conduct of Defendant Emory University was intentional, deliberate, willful, malicious, reckless and conducted in callous disregard of the rights of Plaintiff, entitling Plaintiff to punitive damages.

146.

By reason of Defendant Emory University's discrimination, Plaintiff is entitled to all remedies available for violations of 42 U.S.C. § 1981.

147.

As a result of Defendant Emory University' violation of 42 U.S.C. § 1981,

Plaintiff has been damaged in the sum of no less than $1,500,000.

## **COUNT IV**
*(Retaliation in Violation of 42 U.S.C. § 1981)*

148.

Plaintiff re-alleges and incorporates by reference each and every allegation in each and every aforementioned paragraph as if fully set forth herein.

149.

Plaintiff was an employee of Defendant Emory University and is protected by 42 U.S.C. § 1981 from retaliation and retaliatory discharge.

150.

Plaintiff complained to Defendant Emory University about the race discrimination she was subjected to during her employment with Defendant Emory University.

151.

Plaintiff's complaints were ignored and discouraged by Defendant Emory University.

152.

Plaintiff notified Defendant Emory University of the race discrimination she was subjected to and protested the harassment.

153.

Plaintiff's protest to Defendant Emory University about the race

discrimination she was subjected to during her employment with Defendant Emory University was a protected activity under 42 U.S.C. § 1981.

154.

Defendant Emory University, unlawfully and without cause, retaliated against Plaintiff as a direct result of Plaintiff complaining about the incidents of race discrimination.

155.

Because she protested Defendant Emory University's unlawful behavior, Plaintiff was subjected to retaliation.

156.

The retaliation substantially interfered with the employment of Plaintiff and created an intimidating, offensive, and hostile work environment in violation of 42 U.S.C. § 1981.

157.

Defendant Emory University knew and should have known about the retaliation and the affect it had on Plaintiff's employment and failed to take any action to stop the retaliatory conduct.

158.

As a direct and proximate result of said unlawful employment practices and disregard for Plaintiff's rights and sensibilities, Plaintiff has lost and will continue

to lose substantial income including, but not limited to wages, social security, and other benefits due her.

159.

Additionally, Plaintiff has suffered the indignity of discrimination and retaliation, the invasion of her rights to be free from discrimination, and great humiliation, which has manifested in serious emotional distress.

160.

As a further direct and proximate result of said unlawful employment practices and retaliation, Plaintiff has suffered extreme mental anguish, outrage, severe anxiety about her future and her ability to support herself and her family, harm to her employability and earning capacity, painful embarrassment among his family, friends, and co-workers, damage to her good reputation, disruption of her personal life, and the loss of enjoyment of the ordinary pleasures of everyday life.

161.

As a result of Defendant Emory University's violation of 42 U.S.C. § 1981, Plaintiff has been damaged in the sum of no less than $1,500,000.

## COUNT V
*(Unequal Pay in Violation of the Equal Pay Act 29 U.S.C. §§ 206, et seq.)*

162.

Plaintiff repeats and realleges the allegations contained in the paragraphs above as if separately set forth here.

163.

The acts and practices of Defendant constitutes discrimination against Plaintiff in violation of the Equal Pay Act by unlawfully paying female, non-Black employees, and/or female employees who had children, who were pregnant, and/or who had childcare responsibilities and employees with disabilities less than male employees or those who were not of this status.

164.

At all relevant times, Defendant is an "employer" engaged in interstate commerce and/or in the production of goods for commerce.

165.

At all relevant times, Plaintiff was an employee and Defendant is an employer within the meaning of the Equal Pay Act.

166.

At all relevant times, Defendant employed and/or continue to employ employees, including Plaintiff. At all relevant times, Defendant had gross operating revenues in excess of $500,000.00.

167.

Defendant was aware of complaints and requests for investigation made by Plaintiff concerning the unfair pay practices but did not rectify or investigate its unlawful pay practices.

168.

Defendant's violations of the Equal Pay Act were willful and/or reckless, entitling Plaintiff to the three-year statute of limitations and liquidated damages available under the FLSA and the Equal Pay Act.

## **PRAYER FOR RELIEF**

**WHEREFORE,** for the foregoing reasons, it is specifically requested that this Court grant Plaintiff judgment as follows:

A.     On Count I, awarding Plaintiff compensatory and other damages, including punitive damages in an amount to be determined at trial but in any case, no less than $1,000,000.00;

B.     On Count II, awarding Plaintiff compensatory and other damages, including punitive damages in an amount to be determined at trial but in any case, no less than $1,000,000.00;

C.     On Count III, awarding Plaintiff compensatory and other damages, including punitive damages in an amount to be determined at trial but in any case, no less than $1,000,000.00;

D.     On Count IV, awarding Plaintiff compensatory and other damages, including punitive damages in an amount to be determined at trial but in any case, no less than $1,000,000.00;

E.      On Plaintiff's Count V, awarding Plaintiff compensatory and other damages, including punitive damages in an amount to be determined at trial but in any case, no less than $1,000,000.00;

F.      Awarding Plaintiff, the costs and disbursements of this action, including reasonable attorneys' fees, together with such other and further relief as this court deems equitable, proper, and just.

Respectfully submitted this 23rd day of August, 2022.

MOORMAN PIESCHEL LLC

/s/ Christopher G. Moorman
Christopher G. Moorman, Esq.
Georgia State Bar Number 521490
One Midtown Plaza
1360 Peachtree Street, N.E.
Suite 1205
Atlanta, Georgia 30309
Telephone: (404) 898-1242
Facsimile: (404) 898-1241
Email: cgm@moormanpieschel.com

GODDARD LAW PLLC

/s/ Megan S. Goddard
Megan S. Goddard, Esq.
[*Pro Hac Vice Pending*]
39 Broadway, Suite 1540
New York, NY 10006
Telephone: (646) 504-8363
Facsimile: (212) 208-2914
Email: Megan@goddardlawnyc.com