IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| SHANEQUA MCCRAE, | : | CIVIL ACTION NO. |
| | : | 1:22-CV-3401-TWT-JSA |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| EMORY UNIVERSITY, | : | **FINAL REPORT AND** |
| | : | **RECOMMENDATION ON A** |
| Defendant. | : | **MOTION FOR SUMMARY JUDGMENT** |

Plaintiff Shanequa McCrae ("McCrae" or "Plaintiff") filed the above-captioned action on August 23, 2022. In her Second Amended Complaint [27], Plaintiff alleges that Defendant Emory University ("Emory" or "Defendant"), her former employer, discriminated against her on the basis of race and pregnancy in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e, *et seq*, as amended by the Pregnancy Discrimination Act of 1978, 42 U.S.C. § 2000e(k), and the Civil Rights Act of 1866 ("§ 1981"), 42 U.S.C. § 1981.

The action is before the Court on Defendant's Motion for Summary Judgment [72]. For the reasons discussed below, the Court **RECOMMENDS** that Defendant's Motion for Summary Judgment [72] be **GRANTED IN PART, DENIED IN PART**.

## I.    FACTS

Unless otherwise indicated, the Court draws the following facts from "Defendant's Statement of Undisputed Material Facts in Support of its Motion for

Summary Judgment" [72-2] ("Def. SMF") and "Plaintiff's Rule 56.1 Statement and Response to Defendant's Statement of Material Facts" [76] ("Pl. SMF"), and their associated exhibits. The Court may also draw some facts from "Defendant's Response to Plaintiff's Statement of Material Facts" [81] ("Def. Resp. SMF").

For those facts submitted by Defendant that are supported by citations to record evidence, and for which Plaintiff has not expressly disputed with citations to record evidence, the Court must deem those facts admitted, pursuant to Local Rule 56.1(B). *See* LR 56.1(B)(2)(a)(2), NDGa ("This Court will deem each of the movant's facts as admitted unless the respondent: (i) directly refutes the movant's fact with concise responses supported by specific citations to evidence (including page or paragraph number); (ii) states a valid objection to the admissibility of the movant's fact; or (iii) points out that the movant's citation does not support the movant's fact or that the movant's fact is not material or otherwise has failed to comply with the provisions set out in LR 56.1(B)(1)."). Accordingly, for those facts submitted by Defendant that Plaintiff has failed to dispute with citations to record evidence, the Court must accept the facts as true, so long as the facts are supported by citations to record evidence, do not make credibility determinations, and do not involve legal conclusions. *See E.E.O.C. v. Atlanta Gastroenterology Assocs., LLC*, No. CIV. A. 1:05-CV-2504-TWT, 2007 WL 602212, at *3 (N.D. Ga. Feb. 16, 2007).

The Court has excluded assertions of fact by either party that are clearly immaterial, or presented as arguments or legal conclusions, and has excluded

assertions of fact unsupported by a citation to admissible evidence in the record or asserted only in a party's brief and not in its statement of facts. *See* LR 56.1(B)(1), NDGa ("The court will not consider any fact: (a) not supported by a citation to evidence . . . or (d) set out only in the brief and not in the movant's [or respondent's] statement of undisputed facts."). *See also* LR 56.1(B)(2)(b) (respondent's statement of facts must also comply with LR 56.1(B)(1)). The Court has nevertheless viewed all evidence and factual inferences most favorably to the non-movant. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *McCabe v. Sharrett*, 12 F.3d 1558, 1560 (11th Cir. 1994); *Reynolds v. Bridgestone/Firestone, Inc.*, 989 F.2d 465, 469 (11th Cir. 1993).

A.    *Plaintiff's Employment Background and the Start of COVID-19*

In November 2018, Emory hired Plaintiff, a Black woman, as a Licensed Practical Nurse II ("LPN") in its Student Health Clinic. Def. SMF [72-2] ¶ 1. An LPN assists physicians and registered nurses; works with blood, bodily fluids, and other potentially infectious materials; and administers injections, IVs, medications, and treatments. *Id*. ¶¶ 2-4. Plaintiff regularly worked with one physician, Dr. Dawn Mielke. *Id*. ¶ 5. Plaintiff worked at Emory's Student Health Clinic through March 2020, the beginning of the COVID-19 pandemic. *Id*. ¶ 8. During this time, Plaintiff's child's daycare had closed, and Emory permitted Plaintiff to work remotely. *Id*. ¶ 9. From home, Plaintiff participated in morning nursing meetings, handled medication refills, and answered patient questions, although the work was "very seldom." *Id*. ¶

9. When there was no work to be done, Emory placed Plaintiff, along with other employees, on "paid-not-work" status so that she was paid for a 40-hour workweek. *Id*. ¶ 10; Pl. SMF [76] ¶ 10. Sharon Denny ("Denny"), a White LPN, was also permitted to work from home because of her severe asthma. Def. SMF ¶ 11.

B.    *Plaintiff's Return to In-Person Work and COVID-19 Restrictions*

In March 2020, Kimberly Crow ("Crow") became Director of Nursing for Student Health and Plaintiff's direct supervisor. *Id*. ¶ 13. In April 2020, because of changing workflows, Crow directed her entire team (including Plaintiff) to complete a daily questionnaire about telemedicine workflow, logging their hours. *Id*. ¶ 14. Crow asked all the nurses if they were interested in working extra hours on nights or weekends doing COVID-19 contact tracing, but Plaintiff never volunteered for such duties. *Id*. ¶¶ 15-16.

Plaintiff returned to in-person work at the clinic on June 23, 2020, after her child's daycare reopened. *Id*. ¶ 17. Denny, aged sixty-four, did not return to work because of her age and health conditions. *Id*. ¶ 18. By the time Plaintiff returned to work, Emory had created a separate COVID-19 clinic for student patients with respiratory issues who needed COVID-19 testing. *Id*. ¶ 19. Emory also created a temperature monitoring station where it screened incoming patients. *Id*. At this station, an employee asked screening questions, took temperatures, and directed patients accordingly based on their symptoms, in a process that took between thirty seconds and two minutes. *Id*. ¶ 22. Emory also pre-screened patients for symptoms

over the telephone. *Id*. ¶ 21. In the regular Student Health Clinic, LPNs wore N95 masks with a face shield and were permitted to wear an extra mask, which Plaintiff did when working there. *Id*. ¶ 23. At the temperature monitoring station, LPNs also wore gowns and gloves. *Id*. ¶ 24.

On July 20, 2020, because of patient volume, Crow—who was unaware that Plaintiff was pregnant—directed Plaintiff to work in the COVID-19 clinic. Def. SMF ¶ 39. Plaintiff did not feel safe due to the health risks but stated that she was "willing to perform all other job duties within the student health clinic." *Id.* ¶¶ 39-40; McCrae Dep., Ex. 9 [66-9] at 1. At that time, Plaintiff filled out Emory's COVID-19 Attestation Form, stating that she was pregnant and was asking "to be exempt from working in COVID clinics/COVID patients." Def. SMF ¶ 41; McCrae Dep., Ex. 10 [66-10]. Plaintiff submitted a doctor's note, from Dr. Kajal Patel, recommending that Plaintiff be exempted from working with COVID-19 patients because of her pregnancy, be afforded personal protective equipment and other precautions, and "if teleworking is an option, she should be allowed to work from home as much as her schedule would permit." Def. SMF ¶ 44; McCrae Dep., Ex. 11 [66-11].

Crow exempted Plaintiff from working in the COVID-19 clinic, and Plaintiff never worked in that location. Def. SMF. ¶ 42. At this time, Plaintiff did not ask for other accommodations due to her pregnancy; however, on the Attestation form, Plaintiff noted she would need allotted times for eating/snacking. Pl. SMF ¶ 43;

McCrae Dep., Ex. 10. Although at the time Plaintiff indicated that she could work "all other duties" except for within the COVID-19 clinic, she later testified that, in practice, Emory's COVID-19 protocols did not entirely prevent all contact with potentially infected patients in other areas. Def. SMF ¶ 40; McCrae Dep. [66] at 218:3-10.

According to Plaintiff, she suffered from a pregnancy-related condition, hyperemesis gravidarum, which Plaintiff claims gave rise to a particular need for frequent snack breaks. *See* Pl. SMF ¶ 108; McCrae Dep. at 61:2-25. However, the cited evidence does not show that this specific condition was discussed in Dr. Patel's notes or was mentioned to Emory at the time. Pl. SMF ¶ 108 (citing McCrae Dep. at 271:6-274:3). The doctor's note also does not appear to contain any reference to any eating-related accommodation. *See* McCrae Dep., Ex. 11. Plaintiff's Attestation form generally referred to the fact of her pregnancy and on that basis, she requested exemption from working with COVID patients and "regular allotted times for eating/snacking/a lunch break." McCrae Dep., Ex. 10 at 1-2. Plaintiff's Statement of Facts does not refer to any specific eating schedule that was requested or denied; however, the testimony cited indicates that during a meeting, Crow asked Plaintiff, "what do you mean you can't wait to eat until 3:00 o'clock…what do you mean you can't hold out. Are you kidding me?" McCrae Dep. at 272:1-9. Plaintiff also stated that Crow "scrutinized" her for leaving her nurse's station to eat but also instructed her not to eat at the nurse's station. *Id*. at 273:19-274:3. Crow also made critical

comments in an August 2020 performance review, after Plaintiff had disclosed her pregnancy, that Plaintiff was "often" eating at her desk. Pl. SMF ¶ 110; *See* Crow Dep. [67] at 52:4-53:12.

C.    *Plaintiff's Return to Remote Work*

On August 13, 2020, Crow announced the resumption of the Student Health Clinic's Fall operating hours. Def. SMF ¶ 48. Plaintiff responded that the hours "do not work for [her]" because of her child's daycare hours and requested late arrival and early departure. *Id*. ¶ 49. Crow agreed, and reminded Plaintiff that she could use Emory's paid COVID-19 Childcare Leave to supplement any missing time. *Id*. ¶¶ 49-50. Plaintiff then decided to remove her child from daycare and enroll her in a different school that required more virtual hours to reduce their risk of exposure to COVID. *Id*. ¶¶ 51-52; McCrae Dep. at 86:4-16. Plaintiff requested to work remotely to be with her child for virtual schooling and Crow approved Plaintiff to work from home beginning mid-September. Def. SMF ¶¶ 52-55. Plaintiff testified that the discussion about working from home at this time included the projection that she would not return to work until after giving birth. McCrae Dep. at 87:7-10.

Around this time, Crow approved Ashley Robinson's ("Robinson")—another Black LPN who was not pregnant—request to work from home because of childcare issues. Def. SMF ¶ 57. Crow contacted human resources to find additional work for the three remote-working nurses (Plaintiff, Robinson, and Denny) to perform. *Id*. ¶ 58. After Crow cautioned Plaintiff that there might not be enough virtual work for a

full-time 40-hour work week, Plaintiff contacted human resources about potential redeployment assignments. *Id.* ¶ 60. Redeployment assignments served as an option for underutilized staff in departments who were willing to work outside their typical areas and had little work to do, given that many students at this time were off campus. *Id.* ¶ 61. However, Student Health LPNs were considered "crucial" and were not eligible for redeployment. *Id.* ¶¶ 61-63. Plaintiff does not know which employees were redeployed and is unaware of whether any LPNs were redeployed. *Id.* ¶¶ 65-66.

While the three nurses were working from home, Denny spoke at least daily with Crow or other supervisors about her assignments and the work she was doing. Def. SMF ¶ 72. In contrast, Plaintiff and Robinson took issue with Crow asking for status updates. *Id.* ¶ 73. Crow created a chart to keep track of remote tasks and asked that the three nurses complete the chart each day. *Id.* ¶ 76. Plaintiff filled out the chart once and thereafter told Crow that Crow should instead examine the individual Electronic Medical Stamps of her work in the system to verify that she was performing work. Def. SMF ¶ 77; Pl. SMF ¶ 77; *see* McCrae Dep. at 65:21-67:4, 131:18-135:3. Plaintiff's refusal to complete the log led Crow to have concerns about Plaintiff's work output and whether Plaintiff was completing a full 40-hour week. Def. SMF ¶¶ 77, 87. Plaintiff felt like Crow was "micromanaging" her and accusing her of not working, partly due to the demands of Plaintiff having her child at home. Pl. SMF ¶ 111; *see* McCrae Dep. at 64:15-66:11. Crow did not accuse

Denny of not working the required hours, which according to Crow, was because Denny recorded her tasks on the spreadsheet as asked. *See* Crow Dep. at 78:21-80:1.

> D.    *Emory's Request that Plaintiff Return, Plaintiff's Leave, and Plaintiff's Subsequent Resignation*

In the meantime, the workload demands of the Student Health Clinic had grown, and Emory was seeking to hire another, full-time nurse to fill the staffing needs in the office. Def. SMF ¶ 88. On or about October 8, 2020, Crow also informed Plaintiff and Robinson that "due to the needs of the clinic and work from home volumes, [their remote working] arrangement can no longer be supported." *Id*. ¶ 89; Crow Dep. at 91:17-92:20. Thus, Crow instructed Plaintiff and Robinson, who were both Black, but only one of which (Plaintiff) was pregnant or otherwise requested accommodations, to return to the office on Monday, October 19, 2020. Def. SMF ¶¶ 89, 90. Denny, who was White, and who was not pregnant but had indicated that she suffered from other health problems, was permitted to remain working remotely. *Id*. ¶ 91. On October 9, 2020, Plaintiff sent an email complaining about Crow, alleging racial discrimination. Pl. SMF ¶ 116.[1] Emory's Human Resources Department did

---

[1] Plaintiff separately complained about Crow in July 2020, but Plaintiff's Statement of Facts does not state that this complaint was on the basis of race or pregnancy discrimination. *See* Pl. SMF ¶ 126. The Court also notes that other Emory employees, including Robinson, have lodged complaints against Crow, including on grounds of race. *Id.* ¶¶ 125, 127. Generally, unsworn, third-party hearsay complaints by themselves may not be admissible to show race discrimination. *Macuba v. Deboer*, 193 F.3d 1316, 1322 (11th Cir.1999) ("The general rule is that inadmissible hearsay cannot be considered on a motion for summary judgment."). However, the Court need not make any final determinations in that regard because as discussed

not investigate this complaint but forwarded it to Emory's Department of Equity and Inclusion ("DEI"); Emory's DEI found that the charge was unsupported. Pl. SMF ¶¶ 117-18; Def. Resp. SMF [81] ¶ 117.

Plaintiff refused to return to work as directed because she would have had to pay more for childcare and because she feared COVID-19. Def. SMF ¶ 93. Plaintiff exhausted her paid COVID-19 Childcare Leave, paid vacation, and sick leave through November 18, 2020. *Id*. ¶ 94. On October 30, 2020, Plaintiff, who was still pregnant, obtained a note from her OB/GYN stating, "I feel it would be preferable to her to work remotely due to COVID-19." *Id*. ¶ 95; McCrae Dep., Ex. 16 [66-16]. Emory sought clarification from the doctor to confirm whether this request for remote work was medically necessary or, rather, just "preferred." Def. SMF ¶ 96; Truesdale Dep., Ex. 6 [70-6] at 3. The doctor responded that the request was preferred, not "necessary." Truesdale Dep., Ex. 6 at 1. Thus, Emory explained to Plaintiff that it could not honor the request to work remotely for a mere preference, and it offered her two options to return in person: (1) to return to the office full-time in her former position as a LPN, or (2) to return full-time as a temperature screener at the front door of the lobby (not within the COVID-19 clinic), in a role that "does not require you to touch patients-only to speak to them and take their temp all while wearing the appropriate PPE." Def. SMF ¶ 97; McCrae Dep., Ex. 17 [66-17] at 1-2.

_____

below, there are other facts that support denial of summary judgment on grounds of race discrimination.

10

Plaintiff did not accept any of these offers. Def. SMF ¶¶ 98-99. Instead, Plaintiff took unpaid FMLA leave and other unpaid leave through the remainder of her pregnancy; after giving birth, Plaintiff took paid parental leave. *Id*. ¶¶ 98-100. Plaintiff returned to work as an LPN in May 2021 and voluntarily resigned in August 2021. *Id*. ¶ 101. Emory's Human Resources officer, Karen Truesdale ("Truesdale"), told Plaintiff both verbally and via email in November 2020 that she (Truesdale) would look into potential further telework options for Plaintiff, but apparently nothing further was offered. Pl. SMF ¶¶ 128-129; Truesdale Dep., Ex. 10 [70-10]; McCrae Decl. [77-16] ¶ 23.

As noted above, Denny, a White LPN who shared the same supervisors as Plaintiff, was allowed to keep working from home on basis of health conditions but was not required to present any doctor's note or other evidence of medical needs. Pl. SMF ¶¶ 118, 119. On the other hand, Plaintiff was told that her request to remain on telework status was denied based on the doctor's acknowledgement that it was merely a "preference." Def. SMF ¶¶ 96-97. When Plaintiff asked the doctor for clarification, the doctor and his assistant stated that they were not "getting in between HR and her." *Id*. Pl. SMF ¶ 123. Plaintiff was later diagnosed with gestational diabetes from a different provider, although Plaintiff's Statement of Facts does not state whether this information was transmitted to Emory as part of any renewed request for accommodations. *Id*. ¶ 124.

When Plaintiff returned to work in May 2021, after she delivered her baby and took parental leave, Plaintiff perceived that "Crow's treatment of her had not changed despite the fact that [Plaintiff] was working in person." *Id.* ¶ 130. As noted above, Plaintiff voluntarily resigned three months later in August. Def. SMF ¶ 101.

E.    *Procedural History*

The Court previously dismissed Plaintiff's claims of retaliation and any claims based on theories of constructive discharge and/or disparate impact. *See* Report and Rec. [37]; Order [39]. However, the Court allowed Plaintiff's race and pregnancy discrimination claims based on "alleged disparate treatment discrimination in relation to Plaintiff's work assignments," along with Plaintiff's claim for punitive damages and expenses of litigation, to proceed past the motion to dismiss stage. *See* Report and Rec. [37]; Order [39].

## II.    DISCUSSION

A.    *Summary Judgment Standard*

Summary judgment is authorized when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Dietz v. Smithkline Beecham Corp.*, 598 F.3d 812, 815 (11th Cir. 2010). The party seeking summary judgment bears the burden of demonstrating the absence of a genuine dispute as to any material fact. *See Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 175 (1970); *Bingham, Ltd. v. United States*, 724 F.2d 921, 924 (11th Cir. 1984). The movant carries this burden by

showing the court that there is "an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). In making its determination, the court must view the evidence and all factual inferences in the light most favorable to the nonmoving party. *See Jurich v. Compass Marine, Inc.*, 764 F.3d 1302, 1304 (11th Cir. 2014).

Once the movant has adequately supported its motion by citing to materials in the record, the party opposing summary judgment must come forward with specific facts that demonstrate the existence of a genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The nonmoving party is required "to go beyond the pleadings" and to present competent evidence designating "specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324. Generally, "[t]he mere existence of a scintilla of evidence" supporting the nonmoving party's case is insufficient to defeat a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

If a fact is found to be material, the court must also consider the genuineness of the alleged factual dispute. *Id.* An issue is not genuine if it is unsupported by evidence, or if it is created by evidence that is "merely colorable" or is "not significantly probative." *Id.* at 250. A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 242. Moreover, for factual issues to be genuine, they must have a real basis in the record. *Matsushita*, 475 U.S. at 587. The nonmoving party "must do more than simply show

that there is some metaphysical doubt as to the material facts." *Id.* at 586. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Id.* at 587 (quoting *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 289 (1968)). Thus, the standard for summary judgment mirrors that for a directed verdict: "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 259.

When considering motions for summary judgment, the court does not make decisions as to the merits of disputed factual issues. *See Anderson*, 477 U.S. at 249; *Ryder Int'l Corp. v. First Am. Nat'l Bank*, 943 F.2d 1521, 1523 (11th Cir. 1991). Rather, the court only determines whether there are genuine issues of material fact to be tried. Applicable substantive law identifies those facts that are material and those that are irrelevant. *Anderson*, 477 U.S. at 248. Disputed facts that do not resolve or affect the outcome of a suit will not properly preclude the entry of summary judgment. *Id*.

B.    *Plaintiff's Claims*

Plaintiff has three remaining claims against Defendant. First, Plaintiff asserts that Defendant discriminated against her based on her race in violation of both Title VII and § 1981. Sec. Am. Compl. [27] ¶¶ 130-35, 148-52. Plaintiff further asserts that Defendant discriminated against her based on her pregnancy in violation of Title

VII, as amended by the Pregnancy Discrimination Act. *Id.* ¶¶ 136-41. Defendant has moved for summary judgment on all of Plaintiff's claims.

      1.      Standards of Proof under Title VII and § 1981

Title VII makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Title VII also prohibits employers from retaliating against employees because of their opposition to practices made unlawful under the statute or their participation in related proceedings. *Id.* at § 2000e-3(a).

Similarly, § 1981 provides that "[a]ll persons . . . shall have the same right in every State and Territory to make and enforce contracts . . . as is enjoyed by white citizens[.]" 42 U.S.C. § 1981(a). It is well-settled law that the statute prohibits race discrimination in the context of employment. *See Little v. United Techs., Carrier Transicold Div.*, 103 F.3d 956, 961 (11th Cir. 1997); *Brown v. Am. Honda Motor Co.*, 939 F.2d 946, 949 (11th Cir. 1991) ("The aim of the statute is to remove the impediment of discrimination from a minority citizen's ability to participate fully and equally in the marketplace."); *see also St. Francis College v. Al-Khazraji*, 481 U.S. 604, 609 (1987) ("Although § 1981 does not itself use the word 'race,' the Court has construed the section to forbid all 'racial' discrimination in the making of private as well as public contracts."). Further, § 1981 encompasses claims of race-based

retaliation. *See CBOCS West, Inc. v. Humphries*, 553 U.S. 442, 445 (2008); *Bryant v. Jones*, 575 F.3d 1281, 1301 (11th Cir. 2009).

For employment claims, the elements required to establish a claim under § 1981 generally mirror those required for a Title VII claim. *See Chapter 7 Tr. v. Gate Gourmet, Inc.*, 683 F.3d 1249, 1256-57 (11th Cir. 2012) ("Title VII and § 1981 'have the same requirements of proof and use the same analytical framework.'" (quoting *Standard v. A.B.E.L. Servs., Inc.*, 161 F.3d 1318, 1330 (11th Cir. 1998))); *see also Howard v. B.P. Oil Co.*, 32 F.3d 520, 524 n.2 (11th Cir. 1994); *Brown, v. Am. Honda Motor Co.*, 939 F.2d 946, 949 (11th Cir. 1991).

To prevail on a claim for discrimination or retaliation, a plaintiff must prove that the defendant acted with discriminatory or retaliatory intent. *See Hawkins v. Ceco Corp.*, 883 F.2d 977, 980 (11th Cir. 1989); *Clark v. Huntsville City Bd. of Educ.*, 717 F.2d 525, 529 (11th Cir. 1983). Discriminatory intent may be established either by direct evidence or by circumstantial evidence. *See Lewis v. City of Union City*, 918 F.3d 1213, 1220-21 (11th Cir. 2019). Similarly, proof of unlawful retaliation may be in the form of direct evidence or circumstantial evidence generally governed by the *McDonnell Douglas* burden-shifting framework. *See Donnellon v. Fruehauf Corp.*, 794 F.2d 598, 600 (11th Cir. 1986); *see also Goldsmith v. City of Atmore*, 996 F.2d 1155, 1162-63 (11th Cir. 1993).

Direct evidence is evidence "that is based on personal knowledge or observation and that, if true, proves a fact without inference or presumption."

*Evidence*, *Black's Law Dictionary* (11th ed. 2019); *see also Clark v. Coats & Clark, Inc.*, 990 F.2d 1217, 1226 (11th Cir. 1993); *Carter v. City of Miami*, 870 F.2d 578, 581-82 (11th Cir. 1989); *Rollins v. TechSouth, Inc.*, 833 F.2d 1525, 1528 n.6 (11th Cir. 1987). Only the most blatant remarks whose intent could only be to discriminate constitute direct evidence. *Fernandez v. Trees, Inc.*, 961 F.3d 1148, 1156 (11th Cir. 2020); *Clark*, 990 F.2d at 1226; *Carter*, 870 F.2d at 582. "[D]irect evidence relates to actions or statements of an employer reflecting a discriminatory or retaliatory attitude correlating to the discrimination or retaliation complained of by the employee." *Caban-Wheeler v. Elsea*, 904 F.2d 1549, 1555 (11th Cir. 1990) *abrogated on other grounds by St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 513 (1993); *see also Carter v. Three Springs Residential Treatment*, 132 F.3d 635, 641-42 (11th Cir. 1998).

Evidence that merely "*suggests* discrimination, leaving the trier of fact to *infer* discrimination based on the evidence" is, by definition, circumstantial. *Earley v. Champion Int'l Corp.*, 907 F.2d 1077, 1081-82 (11th Cir. 1990); *see Harris v. Shelby Cty. Bd. of Educ.*, 99 F.3d 1078, 1083 n.2 (11th Cir. 1996) ("given that . . . statements could by inference have more than one possible meaning, [plaintiff] has not presented direct evidence of discrimination"). Because direct evidence of discrimination is seldom available, a plaintiff must typically rely on circumstantial evidence to prove discriminatory intent, which can be done using the *McDonnell Douglas* burden-shifting framework referenced above. *See Holifield v. Reno*, 115

F.3d 1555, 1561-62 (11th Cir. 1997), *abrogated on other grounds by Lewis*, 918 F.3d at 1226; *Combs v. Plantation Patterns*, 106 F.3d 1519, 1527-28 (11th Cir. 1997). Under the *McDonnell Douglas* standard, a plaintiff may establish a *prima facie* case of discrimination by showing that (1) she is a member of a protected class; (2) she was subjected to an adverse employment action by her employer; (3) she was qualified to do the job in question; and (4) her employer treated similarly situated employees outside her protected classification (*i.e.*, those of a different race) more favorably than it treated her. *Lewis*, 918 F.3d at 1220-21; *see McDonnell Douglas*, 411 U.S. 792, 802 (1973). To establish a *prima facie* case of illegal retaliation, a plaintiff must show that: (1) she engaged in a protected activity or expression, (2) she received an adverse employment action, and (3) there was a causal link between the protected expression and the adverse employment action. *See, e.g.*, *Knox v. Roper Pump Co.*, 957 F.3d 1237, 1244 (11th Cir. 2020); *Chapter 7 Tr. v. Gate Gourmet, Inc.*, 683 F.3d 1249, 1258 (11th Cir. 2012); *Wideman v. Wal-Mart Stores, Inc.*, 141 F.3d 1453, 1454 (11th Cir. 1998).

Once a *prima facie* case has been established under the *McDonnell Douglas* framework, the employer must come forward with a legitimate non-discriminatory reason for its action. *Lewis*, 918 F.3d at 1221; *Goldsmith*, 996 F.2d at 1162-63; *Donnellon v. Fruehauf Corp.*, 794 F.2d 598, 600-01 (11th Cir. 1986). This is merely a burden of production and not persuasion, and thus is an extremely light one. *Tipton v. Canadian Imperial Bank of Commerce*, 872 F.2d 1491, 1495 (11th Cir. 1989). If

the employer carries its burden of production to show a legitimate reason for its action, the plaintiff then bears the burden of proving by a preponderance of the evidence that the reason offered by the defendant is merely a pretext for discrimination. *Lewis*, 918 F.3d at 1221; *Goldsmith*, 996 F.2d at 1162-63; *Donnellon*, 794 F.2d at 600-01.

However, the *McDonnell Douglas* proof structure was "never intended to be rigid, mechanized, or ritualistic. Rather, it is merely a sensible, orderly way to evaluate the evidence in light of common experience as it bears on the critical question of discrimination." *United States Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 715 (1983); *see also Grigsby v. Reynolds Metals Co.*, 821 F.2d 590, 594 (11th Cir. 1987). The Eleventh Circuit has held that this framework of shifting burdens of proof is a valuable tool for analyzing evidence in cases involving alleged disparate treatment, but the framework is only a tool. *Nix v. WLCY Radio/Rahall Comm.*, 738 F.2d 1181, 1184 (11th Cir. 1984), *abrogated on other grounds by Lewis*, 918 F.3d at 1226. Indeed, "establishing the elements of the *McDonnell Douglas* framework is not, and never was intended to be, the *sine qua non* for a plaintiff to survive a summary judgment motion in an employment discrimination case." *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011).

A plaintiff may also defeat a motion for summary judgment by presenting "a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker." *Id.* (internal quotation marks

omitted). As such, the Eleventh Circuit has held that a "plaintiff's failure to produce a comparator does not necessarily doom the plaintiff's case." *Lewis v. City of Union City*, 934 F.3d 1169, 1185 (11th Cir. 2019) (quoting *Smith*, 644 F.3d at 1328). "Even without similarly situated comparators," a plaintiff will survive summary judgment if she presents a convincing mosaic of circumstantial evidence from which a factfinder can infer discriminatory motivation. *Id*. The plaintiff retains the ultimate burden of proving that the defendant is guilty of intentional discrimination. *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981).

### 2.    Counts I and IV – Race Discrimination

In Counts I and IV of the Second Amended Complaint, Plaintiff asserts claims of race discrimination in violation of Title VII and § 1981, alleging that Defendant subjected her to disparate treatment "on the basis of her race regarding the terms and conditions of her employment." Sec. Am. Compl. ¶¶ 130-35, 148-52.

### a.    Plaintiff's *Prima Facie* Case

Defendant argues that Plaintiff cannot establish a *prima facie* case of race discrimination. Def. Br. [72-1] at 13-20. Defendant asserts that Plaintiff's claims regarding her assignment to the temperature monitoring station and lack of redeployment do not show adverse actions, nor does Plaintiff present a valid comparator for these instances. *Id.* at 13, 16-17. Regarding Plaintiff's recall to in-person work, Defendant again contends that Plaintiff lacks a valid comparator, arguing that Denny and Plaintiff were not similarly situated. *Id.* at 18.

In response, Plaintiff generally argues that comparators are not required to establish a *prima facie* case. Pl. Resp. Br. [75] at 9-10, 14. Nonetheless, Plaintiff asserts that she has identified a valid comparator—Denny, the non-pregnant, White nurse. *Id.* at 12, 17-18. Plaintiff further argues that Defendant applies an outdated standard for an "adverse action" and asserts that a plaintiff "'need show only some injury respecting her employment terms or conditions,' or in other words, a 'disadvantageous change in an employment term or condition.'" *Id.* at 13 (citing *Muldrow v. City of St. Louis*, 601 U.S. 346, 359 (2024)). Under this standard, Plaintiff argues that working as an LPN at the height of the pandemic qualifies as "disadvantageous" when compared to a working a redeployed position, either "teleworking or working somewhere where one would not be exposed to COVID patients." *Id.*

As explained above, Plaintiff relies on the following facts to support her claims of race discrimination:

After Plaintiff was directed to work in the COVID-19 clinic, she indicated that she did not feel safe working in the clinic and informed Defendant that she was "willing to perform all other job duties within the student health clinic." Def. SMF ¶¶ 39-40; McCrae Dep., Ex. 9 at 1. Plaintiff then filled out Emory's COVID-19 Attestation Form, stating that she was pregnant and was asking "to be exempt from working in COVID clinics/COVID patients." Def. SMF ¶ 41; McCrae Dep., Ex. 10. Plaintiff also submitted a doctor's note recommending that Plaintiff be exempted

from working with COVID-19 patients because of her pregnancy, be afforded personal protective equipment and other precautions, and "if teleworking is an option, she should be allowed to work from home as much as her schedule would permit." Def. SMF ¶ 44; McCrae Dep., Ex. 11. Crow, Plaintiff's supervisor, ultimately exempted Plaintiff from having to work in the COVID-19 clinic, and Plaintiff never worked there. Def. SMF. ¶ 42.

In August 2020, Plaintiff requested to work from home, citing her child's virtual schooling. Def. SMF ¶ 52. Just before Plaintiff returned to remote work, she inquired about "redeployment assignments" after Crow cautioned Plaintiff that there might not be enough virtual work for full-time 40-hour work week. *Id*. ¶ 60. However, Student Health LPNs, like Plaintiff, were considered "crucial" and were not eligible for redeployment. *Id*. ¶¶ 61-63. Thus, Defendant did not give Plaintiff a temporary redeployment assignment. *Id.* ¶ 64. Plaintiff ultimately began working from home again on September 16, 2020. *Id.* ¶ 69.

Eventually, Plaintiff was ordered to return to work in-person due to the needs of the clinic and work from home volume. *Id.* ¶ 89 Plaintiff refused to return, in part due to fear of COVID-19, and she submitted notes from her doctor to support her request to continue working from home. *Id.* ¶¶ 93-95. However, Plaintiff's doctor indicated that it was a "preference" for Plaintiff to work remotely and Defendant denied Plaintiff's request. *Id.* ¶¶ 97-98. In contrast, Denny was allowed to continue working from home due to her health conditions but was not required to present any

doctor's note or other evidence of medical needs. Pl. SMF ¶¶ 119, 122. Plaintiff subsequently exhausted all of her leave. Def. SMF ¶¶ 94, 99-100.

The Court finds that an issue of fact exists as to whether Plaintiff was discriminated against based on her race when she was forced to return to work in-person. As explained, under the *McDonnell Douglas* standard, a plaintiff may establish a *prima facie* case of discrimination by showing that (1) she is a member of a protected class; (2) she was subjected to an adverse employment action by her employer; (3) she was qualified to do the job in question; and (4) her employer treated similarly situated employees outside her protected classification (i.e., those of a different race) more favorably than it treated her. *See Lewis v. City of Union City*, 918 F.3d 1213, 1220-21 (11th Cir. 2019).

First, as to Defendant recalling Plaintiff to work in-person, the Court finds that Denny is valid comparator. To satisfy the comparator prong of a *prima facie* case of discrimination, a plaintiff does not have to prove that "she and her comparators are identical; save for their race or gender;" and it is not necessary that a plaintiff and her comparators have "precisely the same [job] title[s]" or functions. *Lewis*, 918 F.3d at 1127; *Johnson v. Miami-Dade Cty.*, 948 F.3d 1318, 1326 n.7 (11th Cir. 2020). Rather, the "requirement is met when the plaintiff presents 'evidence of a comparator—someone who is similarly situated in all material respects.'" *Tynes v. Florida Dep't of Juvenile Justice*, 88 F.4th 939, 944 (11th Cir. 2023 (quoting *Jenkins v. Nell*, 26 F.4th 1243, 1249 (11th Cir. 2022)). To determine

whether a plaintiff presents a valid, similarly situated comparator, the Court assesses whether the comparator 1) engaged in the same basic conduct (or misconduct) as the plaintiff; 2) was subject to the same employment, policy, guideline, or rule as the plaintiff; 3) was under the same jurisdiction of the same supervisor as the plaintiff; and 4) shared the plaintiff's employment or disciplinary history. *Lewis*, 918 F.3d at 1227-28; *McPhie v. Yeager*, 819 F. App'x 696, 698 (11th Cir. 2020); *Pearson v. Georgia through Davis*, 806 F. App'x 940, 949 (11th Cir. 2020). In this case, both Denny and Plaintiff were LPNs and reported to Crow as their supervisor. *See* Denny Decl. [72-14] ¶¶ 2, 6; *see also* Def. SMF ¶¶ 1, 13; Pl. SMF ¶ 120. Both Plaintiff and Denny suffered from medical conditions that heightened their risk of exposure to COVID-19. Def. SMF ¶ 11. Further, they both requested to work remotely and did so during the onset of the pandemic. Def. SMF ¶¶ 11, 69.

Thus, viewing the evidence in the light most favorable to Plaintiff, a jury could infer that Denny was treated more favorably than Plaintiff. Plaintiff's proffered evidence suggests that while Denny and Plaintiff both suffered from medical conditions, Plaintiff was held to a higher and more restrictive standard in assessing her medical need to remain remote. Plaintiff submitted her doctor's notes and Defendant further sought clarification from Plaintiff's doctor to determine whether it would approve Plaintiff's request. Def. SMF ¶¶ 93-98. However, Denny was not required to submit any documentation, nor were her doctors contacted concerning

her work from home accommodation. Pl. SMF ¶¶ 119, 122; Denny Dep. at 21:15-18, 49:17-20.

Crow testified that she believed it would be challenging for Plaintiff to work 40 hours each week because Plaintiff supervised her child during the workday. Crow Dep. at 76:20-77:6. Defendant further presents evidence that Plaintiff refused to complete the work from home chart assigned by Crow, referring to Crow's instructions as "dumb," and believing it was means for Crow to micromanage Plaintiff; indeed, Plaintiff only completed the requested task once. Def. Br. at 20; *see* McCrae Dep. at 67:21-66:4, 131:22-132:14, 135:8-12, 137:13-15. In contrast, Denny logged her completed work tasks and spoke at least daily with Crow about the work she was completing at home. *See* Def. SMF ¶¶ 71-73. Crow testified that she was concerned about the fact that Plaintiff and Robinson were recording eight-hour work time because "they were clocking in and out, but they wouldn't put on the spreadsheet what they were doing." Crow Dep. at 79:14-21.

However, Defendant's Statement of Facts does not clearly state that this evidence, along with its impression of Plaintiff's reliability, was a reason to require Plaintiff to return to work in-person and permit Denny to remain remote; rather Defendant relies on Denny's health as why she was not asked to return. *See* Def. SMF ¶ 91. In sum, a reasonable jury could infer that Plaintiff was discriminated against when she was required to return to work, while Denny was permitted to remain remote without supplying any medical evidence. Thus, Plaintiff has

25

established a *prima facie* case of race discrimination based on Defendant's refusal to allow her to continue working remotely.

In contrast, the Court cannot find that Plaintiff's remaining theories of race discrimination can survive. First, as to Plaintiff's assignment to the temperature monitoring station, the Court agrees that Plaintiff fails to identify an adverse action. Even under the standard articulated in *Muldrow*, Plaintiff cannot establish that she was disadvantaged by being assigned to the temperature monitoring station. Crow directed Plaintiff to work in the COVID-19 clinic but due to the risk of exposure, Plaintiff refused and indicated that she was "willing to perform all other job duties within the student health clinic." Def. SMF ¶¶ 39-40; McCrae Dep., Ex. 9 at 1. Crow ultimately exempted Plaintiff from having to work in the COVID-19 clinic, and indeed Plaintiff never worked in that location. Def. SMF. ¶ 42. Plaintiff's assignment to the temperature monitoring station was means to accommodate Plaintiff's request to avoid the COVID-19 clinic.[2] Pl. SMF ¶¶ 26-27, 42. Moreover, the temperature monitoring station was created based on the operational needs of the clinic during the pandemic and Plaintiff does not dispute this notion. *Id.* ¶ 26. Additionally, Plaintiff does not present a relevant White comparator that did not perform

---

[2] Plaintiff claims that her assignment to the temperature monitoring station did not accommodate her request to avoid COVID patients because Defendant's "screening process did not effectively sequester patients with COVID symptoms to the COVID clinic." Pl. Br. at 4. However, Plaintiff does not allege that she was ever exposed to COVID-19.

temperature monitoring. *See* Def. SMF ¶ 29 ("McCrae does not recall which other LPNs did temperature monitoring and cannot name any white LPN that did not."); *see* McCrae Dep. at 159:16-160:11.

Likewise, Plaintiff cannot establish that Defendant's redeployment decision was based on her race. Again, Plaintiff fails to proffer a valid comparator, as she testified that she is unaware of any other Student Health LPNs, White or otherwise, who were redeployed. *See* McCrae Dep. at 208:4-6, 208:23-25. Although Plaintiff argues that "comparators are not required to make out a *prima facie* case," so long as a plaintiff presents various forms of circumstantial evidence, Plaintiff fails to proffer additional facts to support the notion that both instances—Plaintiff's assignment to the temperature monitoring station and Defendant's redeployment decision—were due to discrimination. Without pointing to specific evidence that Crow was motivated by discriminatory animus, Plaintiff's bare allegations of Crow's intent is not enough to survive Defendant's Motion for Summary Judgment.

Accordingly, the Court finds that Plaintiff has established a *prima facie* case of race discrimination solely as to Defendant's revocation of Plaintiff's remote-working arrangement and requirement to return to work in-person, in contrast to the allegedly more favorable treatment afforded to Denny.

b.    Defendant's Non-Discriminatory Reason and Pretext

Defendant argues that Plaintiff cannot rebut its non-discriminatory reason for recalling her to work in clinic because "the clinic needed in-person nurses, not virtual

ones." Def. Br. at 20. Defendant also cites Plaintiff's refusal to complete the tasks assigned to her by Crow and Crow's subsequent concern about Plaintiff's work output. *Id.*

Under the *McDonnell Douglas* framework, a plaintiff may carry the burden of showing that the employer's proffered reasons are pretextual by showing that they have no basis in fact, that they were not the true factors motivating the decision, or that the stated reasons were insufficient to motivate the decision. *See McDonnell Douglas Corp.*, 411 U.S. 792 (1973); *see also Wisdom v. M.A. Hanna Co.*, 978 F. Supp. 1471, 1479 (N.D. Ga. 1997). A plaintiff can either directly persuade the court that a discriminatory or retaliatory reason more likely motivated the employer or show indirectly that the employer's ultimate justification is not believable. *See Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 256 (1981).

In other words, a plaintiff can show evidence, including the evidence establishing the *prima facie* case, sufficient to permit a reasonable factfinder to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision. *Burdine*, 450 U.S. at 256; *McDonnell Douglas*, 411 U.S. at 804; *see also Chapman v. AI Transp.*, 229 F.3d 1012, 1024 (11th Cir. 2000) (*en banc*); *Combs v. Plantation Patterns*, 106 F.3d 1519, 1530 (11th Cir. 1997) ("In order to establish pretext, the plaintiff is not required to introduce evidence beyond that already offered to establish the *prima facie* case."). A court may consider all of the plaintiff's evidence supporting the *prima facie* case when evaluating whether the

defendant's reasons for adverse employment action were pretextual. *See Rioux v. City of Atlanta*, 520 F.3d 1269, 1276–77 (11th Cir. 2008), *overruled in part on other grounds by Pearson v. Callahan*, 555 U.S. 223 (2009).

A plaintiff cannot show that an employer's proffered reasons for terminating her were pretextual simply by "quarreling with the wisdom" of those reasons. *See Brooks v. Cty. Comm'n of Jefferson Cty.*, 446 F.3d 1160, 1163 (11th Cir. 2006) (quoting *Chapman*, 229 F.3d at 1030). Nevertheless, a plaintiff may establish pretext if she presents sufficient evidence demonstrating "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence." *Combs*, 106 F.3d at 1538 (quoting *Sheridan v. E.I. DuPont De Nemours & Co.*, 100 F.3d 1061, 1072 (3d Cir. 1996) (*en banc*)). However, "[a] reason is not pretext for discrimination unless it is shown *both* that the reason was false, *and* that discrimination was the real reason." *Brooks*, 446 F.3d at 1163 (emphasis in original) (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993)). Stated another way, it is not the truth of the employer's justifications, alone, that a plaintiff is required to rebut. Rather plaintiff must prove that the employer did not, in fact, rely on those justifications in taking any adverse action against her.

The Court finds that Plaintiff's evidence is sufficient to show that Defendant's proffered reasons for recalling Plaintiff to work may have been pretextual. First, the facts discussed in detail above as to the *prima facie* case can be further found to

relate to the issue of pretext. As explained, the evidence suggests that Defendant held Plaintiff to a more restrictive standard than Denny, requiring only Plaintiff to provide medical documentation. *See* Denny Dep. at 21:15-18, 49:17-20. Though Denny testified that she did not have to provide Defendant any documentation because it already had her information on file, Defendant does not cite this in its Statement of Facts as to why Plaintiff was required to submit documentation from her doctors. *See id*. at 21:19-23; *see generally* Def. SMF. Further, a jury may find that Defendant similarly had notice of Plaintiff's medical condition, as Plaintiff informed them of her pregnancy in the Attestation form and later testified that Crow was informed that Plaintiff would not return to work until after giving birth. McCrae Dep. at 87:7-10. Also as noted above, Defendant's Statement of Facts does not rely on Denny's reliability or work productivity at home to support why Denny was permitted to continue working remotely; rather Defendant cites Denny's health conditions.

Further, Plaintiff presents evidence that suggests that although Plaintiff did not complete the work-log as requested by Crow, there were other means to confirm whether Plaintiff was completing her work while at home. Pl. Br. at 22. While Crow used these means to confirm whether Denny was working, Crow appeared to primarily rely on Plaintiff's work-log, or her lack of completion, to assess if Plaintiff was working. *Id.*; Crow Dep. at 71:11-17 ("Q: How did you confirm that [Denny's] work was being done? A: There was [sic] only some ways to tell. Like prescription

refills, you can look and see if they were in the box. There was [sic] telehealth invites. There was [sic] some things you could see in the medical record, but not everything."); Crow Dep. at 76:10-14 ("Q: Was there any information that you checked on, besides the work-from-home log, that led you to believe Ms. McCrae was not working 40 hours per week? A: Not that I can recall."). Such evidence, viewed in the light most favorable to Plaintiff, suggests possible weaknesses in Defendant's proffered reason for recalling Plaintiff and presents an issue of triable fact best suited for a jury to resolve.

Accordingly, the Court **RECOMMENDS** that Defendant's Motion for Summary Judgment [72] be **DENIED** as to Counts I and IV, Plaintiff's claims of race discrimination under Title VII and § 1981, to the extent those claims are based on Defendant's decision to recall Plaintiff to work in-person.

### 3.    Count II – Pregnancy Discrimination

In Count II of the Second Amended Complaint, Plaintiff asserts a claim of pregnancy discrimination under Title VII, as amended by the Pregnancy Discrimination Act of 1978 ("PDA"), 42 U.S.C. § 2000e(k). Congress added Section 701(k) to Title VII in 1978 specifically to add discrimination on the basis of pregnancy and pregnancy-related conditions as a type of sex discrimination. This section, the PDA, provides in relevant part:

> The terms "because of sex" or "on the basis of sex" include, but are not limited to, because of or on the basis of pregnancy, childbirth, or related medical conditions; and women affected by pregnancy, childbirth or

31

> related medical conditions shall be treated the same for all employment-related purposes, including receipt of benefits under fringe benefit programs, as other persons not so affected but similar in their ability or inability to work . . . .

42 U.S.C. § 2000e(k); *see also Byrd v. Lakeshore Hosp.*, 30 F.3d 1380, 1381-1382 (11th Cir. 1994).

"Rather than introducing new substantive provisions protecting the rights of pregnant women, the PDA brought discrimination on the basis of pregnancy within the existing statutory framework prohibiting sex-based discrimination." *Armstrong v. Flowers Hosp. Inc.*, 33 F.3d 1308, 1312 (11th Cir. 1994). The PDA was designed to ensure that pregnant employees are given the same opportunities and benefits as non pregnant employees who are similarly limited in their ability to work. *See Byrd*, 30 F.3d at 1382. If an employee's pregnancy actually prevents her from fulfilling the duties of her position, her employer is not obligated to give her preferential treatment. *Spivey v. Beverly Enterprises, Inc.*, 196 F.3d 1309, 1312 (11th Cir. 1999) ("The PDA does not require that employers give preferential treatment to pregnant employees.").

Because discrimination based on pregnancy or a pregnancy-related condition is a type of discrimination based on sex, courts have applied the same analysis to claims of pregnancy discrimination that they apply to other claims of sex discrimination, including the *McDonnell Douglas* framework described above in cases involving circumstantial evidence of discrimination. *See Armstrong*, 33 F.3d

at 1312-13 (citing *Maddox v. Grandview Care Ctr., Inc.*, 780 F.2d 987, 989 (11th Cir. 1986)); *Byrd*, 30 F.3d at 1381-1383.

        a.     Plaintiff's *Prima Facie* Case

Plaintiff alleges that Defendant treated her "differently from and less preferably than similarly situated non-pregnant employees" and failed to provide accommodations related to her pregnancy. Sec. Am. Compl. ¶¶ 138. A plaintiff alleging that the denial of an accommodation constituted disparate treatment under the PDA may establish a *prima facie* case by showing that: (1) she was a member of the protected class, (2) she requested a pregnancy-related accommodation, (3) the employer refused her request, and (4) the employer nonetheless accommodated others "similar in their ability or inability to work." *Young v. United Parcel Serv., Inc.*, 575 U.S. 206, 229 (2015); *Durham v. Rural/Metro Corp.*, 955 F.3d 1279, 1285 (11th Cir. 2020).

In this case, it is undisputed that Plaintiff, a pregnant female, was a member of a protected class under Title VII. However, Defendant argues that Plaintiff did not seek an accommodation from temperature monitoring, nor did she request redeployment as a pregnancy accommodation. Def. Br. at 14-15, 17. Defendant further argues that Plaintiff does not identify a comparator that was accommodated in these instances, nor can Plaintiff point to a valid comparator as to her work-from-home claim. *Id.* at 14-15, 17-18.

As explained above, the PDA prohibits pregnancy discrimination, but it does not mandate special pregnancy accommodation. *See Hicks v. City of Tuscaloosa, Ala.*, 870 F.3d 1253, 1260 (11th Cir. 2019) ("[E]mployers do *not* have to provide special accommodations to [pregnant] workers." (emphasis in original)); *Spivey v. Beverly Enterprises, Inc*., 196 F.3d 1309, 1312 (11th Cir. 1999) ("The PDA does not require that employers give preferential treatment to pregnant employees."). Indeed, the PDA does not require employers to extend any benefit to pregnant women that they do not already provide to other disabled employees. *Armindo v. Padlocker, Inc.*, 209 F.3d 1319, 1321 (11th Cir. 2000) (citations omitted).

In this case, the Court finds that an issue of fact exists as to whether Plaintiff was discriminated against based on her pregnancy when she was forced to return to work in-person, while Denny was permitted to continue working remotely. Contrary to Defendant's notion, Denny is a valid comparator for the reasons explained above. Among other things, both Plaintiff and Denny requested to work remotely due to their conditions that heightened their risk of exposure to COVID-19. *See* Denny Decl. ¶¶ 2, 6; *see also* Def. SMF ¶¶ 1, 11, 13, 69; Pl. SMF ¶ 120.

After Defendant informed Plaintiff that her work from home arrangement could no longer be supported, Plaintiff submitted three doctors' notes to Defendant, citing her pregnancy as the reason to remain remote. McCrae Decl. ¶ 22. Defendant refused Plaintiff's request, essentially forcing Plaintiff to exhaust her leave, while permitting Denny to continue working from home. However, Denny's asthma,

rendered her similar to Plaintiff in her inability to work in-person. Indeed, during the height of the pandemic, both asthma and pregnancy were conditions that raise the risk of severe COVID-19 symptoms and complications, which in theory, would prevent both Plaintiff and Denny—and not solely Denny, as argued by Defendant— from safely being in the clinic. And as discussed, in contrast to Plaintiff, Denny was allowed to remain remote without submitting medical documentation. Denny Dep. at 21:15-18, 49:17-20. Thus, viewing the evidence in the light most favorable to Plaintiff, requiring Plaintiff to return to work but not Denny at least creates an issue of triable fact of whether Denny was similar situated in her inability to work but was nonetheless accommodated.

However, the record does not support Plaintiff's claim of pregnancy discrimination prior to October 8, 2020, when Defendant instructed Plaintiff to return to the clinic in-person. In July 2020, after refusing to work in the COVID-19 clinic, Plaintiff completed a COVID-19 Attestation Form informing Defendant that she was pregnant and requesting "regular allotted times for eating/snacking/a lunch break." McCrae Dep., Ex. 10 at 1-2. According to Plaintiff, the request to snack was due to her hyperemesis gravidarum, extreme morning sickness that could be alleviated by eating small amounts of food frequently. McCrae Dep. at 61:14-25, 62:4-16. Plaintiff also provided a doctor's note recommending that she not work with any COVID-19 patients due to her pregnancy. McCrae Dep., Ex. 11. Plaintiff

alleges that she was reprimanded by Crow for taking allotted breaks to eat and manage her condition. Pl. SMF ¶ 108; McCrae Dep. at 171:22-172:4, 273:23-274:3.

Neither the COVID-19 attestation form nor Plaintiff's doctor's note discuss Plaintiff's hyperemesis gravidarum, nor is there any indication that this condition was communicated to Defendant at the time. Pl. SMF ¶ 108 (citing McCrae Dep. at 271:6-274:3), McCrae Dep., Exs. 10-11. Plaintiff alleges that even after Defendant was aware of her pregnancy, human resources failed to ensure that Plaintiff could take her breaks to eat. Pl. SMF ¶ 109. However, the record is devoid of a clear, specific request for a meal schedule shown to be necessary for Plaintiff's condition, and Plaintiff does not cite to any denial of any specific request. *See Young v. United Parcel Serv., Inc.*, 575 U.S. 206, 229 (2015) ("a plaintiff alleging that the denial of an accommodation constituted disparate treatment under the [PDA] may make out a *prima facie* case by showing … that she sought accommodation").

Plaintiff also fails to identify specific requests made to avoid the temperature monitoring station or to be redeployed due to her pregnancy and/or pregnancy-related condition. Even assuming *arguendo* that Plaintiff made such requests, there is no evidence of analogous accommodations being made for other employees. In sum, Plaintiff's Statement of Facts, along with her cited medical records, does not assert that such requests were made, denied to Plaintiff, and allowed to other non-pregnant employees.

Accordingly, the Court finds that Plaintiff has established a *prima facie* case of pregnancy discrimination solely as to Defendant's revocation of Plaintiff's remote-working arrangement and requirement to return to work in-person.

    b. Defendant's Legitimate Non-discriminatory Reason, and Pretext

As explained above, courts have applied the same analysis to claims of pregnancy discrimination that they apply to other claims of sex discrimination, including the *McDonnell Douglas* framework described above in cases involving circumstantial evidence of discrimination. *Young v. United Parcel Serv., Inc.*, 575 U.S. 206, 229 (2015); *Armstrong v. Flowers Hosp. Inc.*, 33 F.3d 1308, 1312-13 (11th Cir. 1994); *Everett v. Grady Mem'l Hosp. Corp.*, 703 F. App'x 938, 948 (11th Cir. 2017). Once a defendant rebuts a presumption of unlawful discrimination raised by the plaintiff's *prima facie* case, to prevail, the plaintiff must then show that the defendant's non-discriminatory reason is pretext for discrimination. *Armstrong*, 33 F.3d at 1314.

The Court finds that Plaintiff's evidence is sufficient to show that Defendant's proffered reasons— that the clinic needed in-person nurses and its concerns about Plaintiffs work-output—may have been pretextual. First, Plaintiff's *prima facie* case can be further found to relate to the issue of pretext. As explained, the evidence suggests that both Plaintiff and Denny endured conditions that raise the risks COVID-19 symptoms, preventing them from safely being in the clinic; however,

despite their similarities in their inability to work in-person, only Denny was allowed to work remotely.

And as explained, Defendant's Statement of Facts does not rely on Denny's reliability, work productivity at home, or her previously documented medical conditions to support why Denny was permitted to continue working remotely, and solely cites Denny's health conditions. Def. SMF ¶ 91. Further, Defendant had other means to ensure Plaintiff was completing her work at home but failed to do so. Crow Dep. at 71:11, 76:10-14.

Plaintiff also presents evidence that despite informing Crow and human resources of her pregnancy in July 2020, and citing it as a reason to work remotely, Crow and North, Senior Manager for Human Resources for Campus Life, determined that Plaintiff wanted to work from home solely to provide childcare for her other children. North Dep., Ex. 5 [69-5] at 1; *see also* Crow Dep., Ex. 9 [67-9] at 2; McCrae Decl. ¶¶ 14, 22. Plaintiff also testified that she and Crow had already discussed that she would not return to the clinic until after she had given birth. McCrae Dep. at 87:3-10. Viewing the evidence in the light most favorable to Plaintiff, a jury could infer that Defendant's mischaracterization of Plaintiff's proffered reasons for seeking remote work accommodation is evidence of pretext.

Accordingly, the Court finds that Plaintiff's evidence suggests an inference of discrimination and that a jury could find that Defendant's proffered reasons were pretextual.

Accordingly, the Court **RECOMMENDS** that Defendant's Motion for Summary Judgment [72] be **DENIED** as to Counts II, Plaintiff's claim of pregnancy discrimination under Title VII, to the extent that claim is based on Defendant's decision to recall Plaintiff to work in-person.

### III.    RECOMMENDATION

For the reasons discussed above, **IT IS RECOMMENDED** that Defendant's Motion for Summary Judgment [72] be **GRANTED IN PART, DENIED IN PART**.

Specifically, **IT IS RECOMMENDED** that Defendant's Motion for Summary Judgment [72] be **GRANTED** as to any theories of race discrimination under Title VII and § 1981 in Counts I and IV of the Second Amended Complaint premised on Plaintiff's assignment to the temperature monitoring station, lack of redeployment, or any conduct prior to October 2020. **IT IS FURTHER RECOMMENDED** that the Defendant's Motion for Summary Judgment [72] be **GRANTED** as to any theories of pregnancy discrimination under Title VII in Count II of the Second Amended Complaint also premised on Plaintiff's assignment to the temperature monitoring station, lack of redeployment, or any conduct prior to October 2020.

**IT IS RECOMMENDED** that Defendant's Motion for Summary Judgment [72] be **DENIED** as to any theories of race discrimination under Title VII and § 1981 in Counts I and IV of the Second Amended Complaint premised on

Defendant's decision to recall Plaintiff into the clinic for in-person work. **IT IS FURTHER RECOMMENDED** that Defendant's Motion for Summary Judgment [72] be **DENIED** as to any theories of pregnancy discrimination under Title VII in Count II of the Second Amended Complaint premised on Defendant's decision to recall Plaintiff into the clinic for in-person work.

As this is a Final Report and Recommendation, there is nothing further in this action pending before the undersigned. Accordingly, the Clerk is **DIRECTED** to terminate the reference of this matter to the undersigned.

**IT IS SO RECOMMENDED** this 29th day of January, 2025.

_____
JUSTIN S. ANAND
UNITED STATES MAGISTRATE JUDGE